IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

Donald Louis Colbert, Jr., ) C. A. No. 2:09-0848-CMC-RSC
#77497-004, )
)
        Plaintiff, )
)
    -versus- ) **REPORT AND RECOMMENDATION**
)
Harry Leppin (Director of the )
Federal Bureau of Prisons); )
Mildred Riveria; Anita Jones; )
Rikantas Majauskas MD, )
)
        Defendants. )

This Bivens[1] civil rights action brought on April 2, 2009, by a federal prisoner, proceeding pro se and in forma pauperis, is before the undersigned United States Magistrate Judge for a report and recommendation on the defendants' motion for summary judgment filed on July 2, 2009. 28 U.S.C. § 636(b).

On April 2, 2009, the plaintiff, Donald Louis Colbert, Jr., sued Harley Lappin, Director of the Federal Bureau of Prisons; Mildred Rivera, Warden, FCI Estill; Arnita Jones, Camp Administrator, FCI Estill; and Rikantas Majauskas, M.D., FCI Estill, and alleged he was provided constitutionally deficient

---

[1] Section 1983 is not applicable in suits filed against any federal officials. However such relief is available: "Federal courts have power under 28 U.S.C. §1331 (1994) to award damages occasioned by infringements by federal officials of constitutionally protected interests." Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971).

1

medical care. Plaintiff added Harrell Watts, Administrator of National Inmate Appeals as a defendant by order of the undersigned on April 30, 2009. The Honorable Cameron McGowan Currie, United States District Court Judge, dismissed Defendant Harley Lappin, Director of Federal Bureau of Prisons, on May 20, 2009. The defendants are sued in their individual capacities only. Plaintiff seeks an order from the court directing the defendants to afford him ear surgery[2], as well as damages.

On July 6, 2009, the plaintiff was provided a copy of the defendants' motion for summary judgment, affidavits, and exhibits. He was also given an explanation of dismissal and summary judgment procedure as well as pertinent extracts from Rules 12 and 56 of the Federal Rules of Civil Procedure similar to that required by Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975). Plaintiff filed a response in opposition to the motion with his own affidavit and exhibits on August 6, 2009, and the defendants filed a reply on August 17, 2009. Hence it appears consideration of the motions is appropriate.

---

[2] The plaintiff's prayer for a court order directing the defendant afford him ear surgery is moot as Plaintiff underwent the desired surgery on April 1, 2009, after he filed his complaint. See, Steffel v. Thompson, 415 U.S. 452, 460 (1974). Further, Plaintiff indicated in his opposition to the defendants' motion that since he had the surgery, he wished to drop this prayer for relief from his suit.

## SUMMARY JUDGMENT STANDARD

Pursuant to Fed.R.Civ.P. 56(c), a district court must enter judgment against a party who, "after adequate time for discovery ... fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). Where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law," entry of summary judgment is mandated. Fed.R.Civ.P. 56(c). To avoid summary judgment on defendants' motion, a plaintiff must produce evidence creating a genuine issue of material fact. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 2512 (1986). In determining whether a genuine issue of material fact is in dispute, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, Id. at 255, 106 S. Ct. at 2513-14.

## FACTS

A review of the plaintiff's medical records and the plaintiff's sworn affidavit reveal that the plaintiff first

complained about pain in his right ear on June 16, 2008. (Def. ex. 2 pg. 000022). He was examined by medical staff and assessed with Otitis Media (OM), an inflamation of the middle ear, and prescribed antibiotic eardrops. (pg. 000022). On June 24, 2008, he signed up for sick call complaining of serious pain in his right ear. (pg. 000024 and Def. ex. 3, Declaration of R. Majauskas, M.D.). Defendant Majauskas examined the plaintiff and agreed with the earlier diagnosis of OM. Majuaskas continued the plaintiff on antibiotic ear drops, gave him two medications for pain, gave him Levaquin, a wide spectra antibiotic, and submitted a consult for him to see the Ear, Nose, and Throat (ENT) Specialist as soon as possible. (pp. 000024-025 and Def. ex. 3).

On July 2, 2008, the plaintiff signed up for sick call complaining of inner ear infection. (pg. 000026). Medical staff indicated they advised Plaintiff's counselor that he was scheduled to see the ENT and to have him watch for call outs for his appointment. (Id.)

On July 7, 2008, the plaintiff signed up for sick call requesting a convalescence until he could be seen by the ENT. (pg. 000032). He was given the medical convalescence through July 21, 2008. (Id.)

The next day, July 8, 2008, the plaintiff was taken to see the ENT specialist, Dr. Cassone. (pg. 000028). The ENT diagnosed

a perforated tympanic membrane, recommended Ciprodex ear drops, and a follow up appointment in two to three weeks. (pgs. 000028-029). Upon his return to the prison from the ENT's office, Plaintiff was seen by Dr. Majauskas who prescribed a substitute ear drop since Ciprodex, the medication recommended by the ENT, was not an approved medication on the National Formulary. (pg. 000033 and Def. ex. 3)

On July 21, 2008, an administrative note in the plaintiff's medical records indicate medical staff gave the plaintiff another medical convalescence for two more weeks. (Def. ex. 3 pp. 000034-035).

On July 29, 2008, the plaintiff signed up for sick call complaining of persistent pain. (Id. at pg. 000036).

On July 31, 2008, at approximately 10:30 a.m., Dr. Majauskas called the ENT specialist to discuss the plaintiff's evaluation performed on July 8, 2008, because the prison had not yet received the ENT's report of the evaluation. (Id. at pg. 000037). The ENT recommended that the plaintiff keep his ear dry, use prescription ear drops and antibiotics as needed, and follow-up in a month. (Id.). The ENT also informed Dr. Majauskas that surgery on the plaintiff was not urgently required at that time, but might be needed in the future. (Id.). Therefore, on this same day at approximately 12:30 p.m., Dr. Majauskas met with the plaintiff to discuss the ENT's recommendations and the treatment

plan. (Id.) Dr. Majauskas submitted another consultation request for a follow-up evaluation by the ENT to determine if surgery would be needed and a time table if surgery was indicated. (Id. at pp. 000037-039). Dr. Majauskas also continued the plaintiff on medical convalescence until September 30, 2008. (Id.).

On September 4, 2008, the plaintiff was seen by medical staff for recurrent ear infection and complaining of decreased hearing in his right ear. (pp. 000042-043). He was assessed with chronic OM and given more prescription eardrops. (Id.).

On September 30, 2008, the plaintiff was seen again by the ENT for a follow-up evaluation. (pg. 000047). At that time an audio assessment was performed which showed a very mild high frequency hearing loss with conductive component. The specialist recommended that the plaintiff undergo a right tympanoplasty, a reconstructive surgery for the eardrum. (pg. 000047).

The ENT specialist told the plaintiff that he must keep his right ear dry before the surgery. (Id.). Dr. Mujauskas again examined the plaintiff when he returned from seeing the ENT. (pp. 000048-050 and Def. Ex. 3). Dr. Majauskas noted that the consultation report was pending but that the plaintiff told her that the ENT recommended surgical repair at an unknown time in the future. She also noted that the plaintiff complained of vertigo 2 to 3 times per week which lasted 3 to 5 minutes and which resolved spontaneously. (pp. 000048-50, Def. ex. 3). Dr.

6

Majauskas advised the plaintiff that he would review the ENT's report when it arrived to determine the next step in his treatment. (Id.). Dr. Majauskas also gave the plaintiff a three month work restriction allowing him to work limited duty in controlled environment with restrictions. (Id. and pg. 000052 and Def. ex. 3). Dr. Majauskas scheduled him to return to Health Services in two months if Health Services had not called him to review the ENT's consult before the scheduled appointment. (Id. at pp. 000048-050 and Def ex. 3).

The ENT's report was received at the prison on October 6, 2008, and on October 8, 2008, Betzy Hernandez-Ricoff, M.D., the Regional Medical Director, reviewed the report. (Id. at pg. 000051 and Def. ex. 6, Dec. of Betzy Hernandez-Ricoff, M.D., RMD). In her review, Dr. Hernandez-Ricoff noted that prior to performing the tympanoplasty for chronic perforation of the tympanic membrane, there should be no evidence of acute otitis media in the affected ear for 6 months for the patient's sake and to insure the success of the surgery. (Id.). The doctor noted that repairing a perforation in the setting of a recurrent infection could promote more infectious episodes and impair healing. (Id.). Plaintiff's medical record showed recent treatment for otitis media.[3] (Id.). Therefore, Dr.

---

[3] On September 4, 2008, the plaintiff was diagnosed with chronic OM. (pg. 000043).

7

Hernandez-Ricoff concluded that a tympanoplasty should not be performed at that time. (Id.). She noted that during the next evaluation this needed to be explained to the plaintiff, with orientation on how to keep his ear dry. (Id.).

Plaintiff complains that Dr. Majauskas did not explain why he was not going to have the surgery at that time and did not give him an ear plug, which the plaintiff characterizes as "fail[ing] to follow medical orders given him by Regional Director back on October 8, 2008." (Pl. dec. ¶ 10). However, there is no evidence that Dr. Hernandez-Ricoff ordered Dr. Majauskas to do anything, and Dr. Majauskas affied that she never saw the plaintiff again after she examined him on September 30, 2008, as he left the employ of the prison.

On October 27, 2008, Plaintiff was seen at sick call and stated that he was out of pain medication for his chronic ear pain. (Id. at pp. 000055-056). He was given Naproxen for pain and advised to return as needed. (Id.).

On January 9, 2009, Plaintiff was seen in the Chronic Care Clinic, and the examination revealed both ears were clear, no discharge was found in the ear canal, and no redness was noted. (Def. ex. 2, pp. 000060-062). Medical staff noted that the plaintiff's condition had improved and that there were no signs of infection. (Id.). The plaintiff was educated on how to care for his ear and advised that his surgery had been denied at that

8

time. (Id.). He was given Tylenol and instructed to sign up for sick call if his condition returned. (Id.).

On February 12, 2009, the plaintiff was seen by Dr. Hernandez-Ricoff, who was at FCI Estill for onsite clinical assessments of inmates. (Id. at pp. 000063-064 and Def. ex. 6). She examined the plaintiff who complained of dizziness and vertigo and recurrent falls due to lack of equilibrium. (Id.). Dr. Hernandez-Ricoff explained that before performing a tympanoplasty, the OM in the affected ear should be controlled for six months. (Id.). A review of the plaintiff's medical records showed that he had not received any treatment for OM for the last six months. Therefore, he was a candidate for the tympanoplasty. (Id.). Dr. Hernandez-Ricoff routed the consult for the plaintiff to have the tympanoplasty. (Id.).

On March 3, 2009, the plaintiff saw the ENT who noted that he was ready to have a tympanoplasty, and the surgery was scheduled for March 11, 2009. (Ex. 2, pg. 000066). However the surgery did not take place that day because the ENT's office rescheduled the surgery and Plaintiff was informed the next day. (Id. at pp. 000067-068). Plaintiff was also told that his surgery would be rescheduled and he was advised to return immediately to medical if his condition worsened. (Id.).

The surgery was rescheduled for April 1, 2009. (Id.). On April 1, 2009, Plaintiff was transported from the prison to

the outside hospital and underwent right tympanoplasty on his ear. (Id. at pp. 000069-083). He remained in the hospital overnight and upon his return was seen for a post surgical medical consult. (Id. at pp. 000069-085).

On April 3, 2009, the plaintiff was seen for a follow-up after the tympanoplasty. (Id. at pgs. 000086-088). He was doing well and no discharge was noted in his ear. (Id.). His previous prescriptions for Tylenol, Ranitidine, and antibiotic ear drops were renewed. (Id.). He was also given a prescription for Tylenol with Codeine for pain. (Id.). He was advised to keep his ear clean and dry and return to medical as needed. (Id.). A consult was written for him to see the ENT and he was evaluated by he ENT on April 28, 2009. The ENT noted the ear looked well and recommended another follow-up visit in three months. (Id.).

Plaintiff has not reported back to medical with any complaints regarding his right ear. (Def. ex. 6).

## **DISCUSSION**

A review of the record and relevant case law reveals that the defendants' summary judgment motion should be granted and this matter ended.

The Eighth Amendment prohibits the infliction of cruel and unusual punishment on one who has committed a crime. See, U.S. Const. Amend. VIII. Accordingly, a prisoner makes out a claim under the Eighth Amendment if he can establish that the prison

medical personnel responsible for his care were deliberately indifferent to his serious medical needs. Estelle v. Gamble, 429 U.S. 97 (1976); Amos v. Maryland Dep't of Pub. Safety & Correctional Servs., 126 F.3d 589, 610 (4th Cir. 1997), vacated in part on other grounds, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998). These requirements go beyond even a showing of negligence, and requires Plaintiff to establish the defendants acted with an indifference as would "offend evolving standards of decency." Id.

In Estelle v. Gamble, the prisoner contended that other examinations should have been conducted by the prison's medical staff and that X-rays should have been taken. The Supreme Court pointed out that not "every claim by a prisoner that he has not received adequate medical treatment states a violation." Id. at 105. "Although the Constitution does require that prisoners be provided with a certain minimum level of medical treatment, it does not guarantee to a prisoner the treatment of his choice." Jackson v. Fair, 846 F.2d 811, 817 (1st Cir. 1988); Cf. Whitley v. Albers, 475 U.S. 312, 320 (1986)(a state's responsibility to attend to the medical needs of prisoners does not ordinarily clash with other equally important governmental responsibilities).

Likewise, constitutionally, the government is not required to furnish prisoners the best of care, only reasonable care.

Vinnedge v. Gibbs, 550 F.2d 926 (4th Cir. 1977). The Constitution also does not guarantee a prisoner the treatment of his choice. Jackson v. Fair, 846 F.2d 811 (1st Cir. 1988). The mere failure to treat all medical problems to a prisoner's satisfaction, even if actual medical malpractice is involved, is insufficient to support a claim under § 1983. Sosabee v. Murphy, 797 F.2d 179 (4th Cir. 1986).

Even if the plaintiff could establish negligence in his medical treatment, his cause of action would be in negligence against the defendants. Neither Section 1983 nor Bivens actions provide for a remedy for violation of state law, but only for violations which rise to the level of unconstitutional deprivation. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, supra. Negligence simply is not actionable under § 1983 or Bivens. Daniels v. Williams, 474 U.S. 327 (1986).

In a civil rights claim, whether a medical provider has been deliberately indifferent to a prisoner's serious medical need is a two part inquiry. First, the prisoner must show that he was deprived of an objectively serious human need. Johnson v. Quinones, 145 F.3d 164 (4th Cir. 1998). Second, the plaintiff must demonstrate that the prison official acted with a

"sufficiently culpable state of mind." Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

Farmer v. Brennan, 511 U.S. 825 (1994) and cases interpreting Farmer, make clear that general knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those general facts and the specific serious risk of harm confronting the inmate. See, Farmer, 511 U.S. at 837, 114 S.Ct. at 1978-79 (stating that "the official must both be aware that a substantial risk of serious harm exists, and he must also draw the inference").

Basically, a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837, 114 S.Ct. at 1979. Prison officials must know of and disregard an objectively serious condition, medical need, or risk of harm. A prison official is not liable if he "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." Farmer, 511 U.S. at 844, 114 S.Ct. at 1982; see Rich v. Bruce, 129 F.3d 336, 338 (4th Cir. 1997) (holding that prison official was not deliberately indifferent because he did not actually draw the inference that the prisoner was exposed to a specific risk of harm).

Here, the defendants concede that the plaintiff's diagnosis of OM in his right ear is a serious medical need, which required surgery. (See generally def. ex. 2, 6). On April 1, 2009, the ENT performed a right tympanoplasty and thereafter, the plaintiff was seen by the ENT for a follow-up evaluation who noted that the plaintiff is doing well.

Since the surgery was performed after he filed the instant action, Plaintiff now complains about the length of time which expired between when surgery was recommended on September 30, 2008, and when surgery was performed on April 1, 2009, approximately six months later. It is uncontested that the surgical candidate had to be free of symptoms of OM for six months prior to surgery to insure no harm to the patient and a successful surgery. Plaintiff had a diagnosis of OM in September 2008. Assuming that his OM resolved shortly after that, it appears that his surgery was performed as soon as it could have safely been performed.

Plaintiff has not established that he was harmed at all, much less that he suffered a harm of constitutional magnitude at the hand of any defendant. Nor has he established that any defendant was deliberately indifferent to his serious medical needs. Plaintiff is not entitled to relief and the action should be dismissed.

As an additional sustaining ground, it appears that the defendants are entitled to qualified immunity from suit in their

individual capacities as established by Harlow v. Fitzgerald, 457 U.S. 800 (1982) and its progeny.

## CONCLUSION

Accordingly, for the aforementioned reasons, it is recommended that Defendants' motion for summary judgement be granted and this matter ended.

Respectfully Submitted,

Robert S. Carr
United States Magistrate Judge

Charleston, South Carolina

August 18, 2009

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Court Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. In the absence of a timely filed objection, a district court judge need not conduct a de novo review, but instead must "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005).

Specific written objections must be filed within ten (10) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three (3) days for filing by mail. Fed. R. Civ. P. 6(a) & (e). Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections to:

> Larry W. Propes, Clerk
> United States District Court
> P.O. Box 835
> Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985).